**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| NUVISTA LIGHT AND ELECTRIC COOPERATIVE, INC., *et al.*,<br><br>Plaintiffs,<br>v.<br><br>INTELLIGENT ENERGY SYSTEMS, LLC, et al.,<br><br>Defendants. | Case No. 4:25-cv-00030-SLG |
| INTELLIGENT ENERGY SYSTEMS, LLC, *et al.*,<br><br>Cross-Claimants,<br>v.<br><br>HERCULES SLR, INC.,<br><br>Cross-Defendant. | |

**ORDER REMANDING ACTION**

Before the Court at Docket 10 is Cross-Claimant Intelligent Energy Systems, LLC ("IES")'s Motion to Remand. Cross-Claimant Frontier Power Systems, Inc. joined in the motion at Docket 15. Specially appearing Defendant Hercules SLR, Inc. responded in opposition at Docket 20, to which IES replied at Docket 34. Also before the Court at Docket 19 is Hercules's Motion to Dismiss. Frontier responded in opposition at Docket 28, which IES joined at Docket 35 and to which Hercules

replied at Docket 36. Oral argument on the motions was held on August 3, 2026.[1]

## BACKGROUND

This action arises from the alleged failure of wire rope assemblies used in constructing a wind energy project near Kwethluk, Alaska.[2] In September 2020, Nuvista Light and Electric Cooperative, Inc. ("Nuvista"), a nonprofit Alaska electric cooperative, contracted with IES, an Alaska limited liability company, to develop and construct the Kwethluk wind project, which included installing wind turbines.[3] Umialik Insurance Company ("Umialik") provided insurance coverage to Nuvista for the project.[4] IES contracted with Frontier, a Canadian corporation, to supply the turbines and the equipment needed to erect and stabilize them.[5] In July 2020 and March 2021, Frontier purchased approximately 40 wire rope assemblies from Hercules, a Canadian manufacturer and seller of wire rope products operating under the trade name Wire Rope Industries (Atlantic) ("WRIA").[6]

On September 23, 2022, while IES or its contractors were erecting a wind turbine, two of the wire rope assemblies allegedly failed, causing a gin pole to

[1] Docket 50.

[2] Docket 1-1 at 4.

[3] Docket 1-1 at 2, 4.

[4] Docket 1-1 at 2.

[5] Docket 1-1 at 2, 4.

[6] Docket 1-1 at 2-4; Docket 10-1 at 1-9; Docket 36 at 3.

topple and damaging project equipment.[7] The assemblies were thereafter examined in two separate rounds of testing.[8] According to IES, in June 2023, an expert retained by Hercules's insurer tested the assemblies in the presence of Hercules or WRIA personnel without prior notice to IES or Frontier.[9] Then, in May 2024, representatives of Nuvista, IES, Frontier, Hercules, and their insurers all agreed to conduct additional testing at West Coast Wire Rope & Rigging, a wire rope inspection and testing facility in Portland, Oregon.[10] The agreement executed in connection with the Portland testing included an arbitration clause that provides:

> All disputes that may arise between the parties regarding the interpretation of the contract and the legal effect of the contract shall, to the exclusion of any court of law, be arbitrated and determined in accordance with the latest Commercial Arbitration Rules of the American Arbitration Association. The arbitration proceeding shall be held in the city in that state where the principal office of the Seller is located. The parties recognize and consent to the above mentioned arbitration association's jurisdiction over each and every one of them.[11]

IES alleges that no party objected to how the Portland testing was conducted and that all 30 intact assemblies failed below the anticipated breaking strength.[12]

---

[7] Docket 1-1 at 4-5.

[8] Docket 1-2 at 15-17.

[9] Docket 1-2 at 15-16.

[10] Docket 1-2 at 16.

[11] Docket 10-3 at 1.

[12] Docket 1-2 at 16-17.

On September 20, 2024, Nuvista and Umialik initiated this action in the Bethel Superior Court for the State of Alaska against IES, Frontier, Hercules, WRIA, and Doe Defendants asserting claims for negligence, strict products liability, failure to warn, and breach of the implied warranty of fitness.[13] On December 10, 2024, IES answered the complaint and asserted crossclaims against Hercules and WRIA for breach of contract, breach of warranty, misrepresentation, failure to warn, negligence, products liability, unlawful trade practices, and spoliation.[14]

On August 11, 2025, Hercules specially appeared and removed the case to this Court pursuant to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (the "Convention").[15] On September 10, 2025, IES moved to remand the case back to the state court.[16] On October 9, 2025, Frontier answered the complaint and asserted crossclaims against Hercules for breach of contract, breach of warranty, products liability, indemnity, negligence, and spoliation of evidence.[17] On October 31, 2025, Hercules moved to dismiss Nuvista and Umialik's complaint and the crossclaims by IES and Frontier.[18] On

---

[13] Docket 1-1.

[14] Docket 1-2.

[15] Docket 1 at 2 (citing Convention Done at New York June 10, 1958, Dec. 29, 1970, 21 U.S.T. 2517).

[16] Docket 10.

[17] Docket 16.

[18] Docket 19.

November 13, 2025, pursuant to the parties' stipulation,[19] the Court dismissed all claims by Nuvista and Umialik against all parties in this action with prejudice.[20] The remaining parties then stipulated to continue oral argument on the two pending motions until August 3, 2026.[21]

## JURISDICTION

This Court has jurisdiction to determine whether it has subject matter jurisdiction over this case.[22]

## LEGAL STANDARD

Chapter 2 of the Federal Arbitration Act ("FAA") implements the Convention.[23] 9 U.S.C. § 205 provides:

> Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending.

An arbitration agreement falls under the Convention when: "(1) there is an agreement in writing within the meaning of the Convention; (2) the agreement

[19] Docket 25.

[20] Docket 33.

[21] *See* Docket 42; Docket 46.

[22] *United States v. Ruiz,* 536 U.S. 622, 628 (2002) ("[A] federal court always has jurisdiction to determine its own jurisdiction.").

[23] 9 U.S.C. §§ 201-208.

provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states."[24] An arbitration agreement "relates to" an action when it "could conceivably affect the outcome of the plaintiff's case."[25] "As long as the defendant's assertion is not completely absurd or impossible, it is at least conceivable that the arbitration clause will impact the disposition of the case."[26] But while "[t]he 'relates to' and 'conceivably affect' standard may be broad, . . . it is not limitless."[27]

"In determining the existence of removal jurisdiction, based upon a federal question, the court must look to the complaint as of the time the removal petition was filed."[28]

---

[24] *Balen v. Holland Am. Line Inc.*, 583 F.3d 647, 654-55 (9th Cir. 2009) (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1294 n.7 (11th Cir. 2005)).

[25] *Infuturia Global Ltd. v. Sequus Pharms., Inc.*, 631 F.3d 1133, 1138 (9th Cir. 2011) (emphasis omitted) (first quoting 9 U.S.C. § 205; and then quoting *Beiser v. Weyler*, 284 F.3d 665, 669 (5th Cir. 2002)).

[26] *Beiser*, 284 F.3d at 669.

[27] *Cerner Middle E. Ltd. v. Belbadi Enters. LLC*, 939 F.3d 1009, 1016 (9th Cir. 2019).

[28] *Abada v. Charles Schwab & Co.*, 300 F.3d 1112, 1117 (9th Cir. 2002) (emphasis omitted) (quoting *O'Halloran v. Univ. of Wash.*, 856 F.2d 1375, 1379 (9th Cir. 1988)). *See also Royal Canin,* 604 U.S. 22, 39 (2025) ("When a plaintiff, after removal, cuts out all her federal-law claims, federal-question jurisdiction dissolves.").

## DISCUSSION

### I. Motion to Remand

Hercules removed this action pursuant to 9 U.S.C. § 205, asserting that the parties' dispute "relates to" two arbitration agreements falling under the Convention.[29] First, Hercules asserts that this case is removable under § 205 because both its website and its sales catalog, which IES referenced in asserting its crossclaims,[30] contain a dispute resolution provision providing that:

> The parties agree that any and all disputes or controversies that may arise between the parties arising out of or related to this Quote or the resulting purchase order shall be determined by binding arbitration. Any arbitration proceedings shall be held in Halifax, Nova Scotia.[31]

Second, Hercules asserts that this case is removable under § 205 because the agreement governing the Portland testing in May 2024 contained an arbitration provision applicable to "[a]ll disputes that may arise between the parties regarding the interpretation of the contract and the legal effect of the contract."[32]

Hercules maintains that each arbitration provision falls under the Convention because each agreement involves at least one non-United States party or otherwise bears a reasonable relationship to a foreign state.[33] IES asserts that

---

[29] Docket 1 at 3-4.

[30] Docket 1-2 at 22, ¶¶ 137-38; Docket 19-2 ¶¶ 13-14 (Giannou Decl.).

[31] Docket 1 at 3.

[32] Docket 1 at 3-4.

[33] Docket 1 at 3-4.

neither of the two arbitration provisions identified by Hercules supports removal. As to Hercules's catalog and website, IES asserts those clauses "do not constitute an 'agreement' in any sense of the term," and "weren't even referenced in the quotes and purchase orders between Frontier and WRIA."[34] As to the Portland testing agreement, IES argues it is "inapplicable on its face" because it was executed after the wire assemblies' failure and governs disputes concerning the testing, not the manufacture and failure of the assemblies.[35] The Court addresses each asserted basis for § 205 jurisdiction in turn.[36]

**A. Hercules's Catalog and Website**

Hercules asserts that its written customer terms were available through its catalog and website, that Frontier relied on the catalog in purchasing the assemblies, and that a party's conduct may establish an assent to arbitrate even without a signed agreement to arbitrate.[37] According to Hercules, the fact that Frontier's purchase orders identified the items it sought to purchase from Hercules

---

[34] Docket 34 at 3.

[35] Docket 34 at 3, 14-15.

[36] IES initially asserted that removal was untimely because Hercules did not remove within 30 days of service. Docket 10 at 8-9. Hercules responded that § 205 expressly permits removal "at any time before the trial" and that trial had not commenced when Hercules removed the action. Docket 20 at 4-5. In reply, IES acknowledged that "the discussion of the thirty-day time limit appears to be moot." Docket 34 at 2 n.1. The Court therefore does not consider IES's timeliness argument.

[37] Docket 20 at 8-10.

by reference numbers shows that Frontier must have used the catalog containing the arbitration provision to access those numbers.[38]

IES asserts that Hercules's catalog and website terms do not support jurisdiction under § 205 because (1) Hercules has not produced the catalog containing the asserted arbitration provision or a contemporaneous version of the website terms; (2) the sales documents between Frontier and WRIA neither "reference[]" nor "incorporate[]" the asserted arbitration terms; and (3) there is no evidence that Frontier purchased the assemblies through Hercules's website or assented to the asserted arbitration terms.[39]

IES asserts that Article IV(1)(b) of the Convention requires Hercules to produce "[t]he original agreement . . . or a duly certified copy" of the arbitration agreement it seeks to enforce.[40] However, Article IV prescribes the documents required to obtain recognition and enforcement of an arbitral award, and here, no arbitral award has been issued.[41] Nonetheless, § 205 requires Hercules to identify a written agreement to arbitrate falling under the Convention that could conceivably

---

[38] Docket 20 at 9-10 (citing Docket 10-1 at 1 (Frontier purchase order dated July 8, 2020)). *But see* Docket 10-1 at 2 (WRIA quote dated June 25, 2020 providing the reference numbers for the items Frontier sought to order).

[39] Docket 34 at 7-10.

[40] Docket 34 at 7.

[41] Convention art. IV(1).

affect the outcome of this action.[42] And Article II of the Convention makes clear that the "agreement in writing" to arbitrate must be "signed by the parties or contained in an exchange of letters or telegrams."[43] Here, Hercules has not produced any document signed by Frontier or any other writings in connection with its purchase of the wire assemblies that contains or refers to an arbitration provision. Indeed, Hercules has not produced the catalog containing the asserted arbitration provision or otherwise established what terms appeared in the catalog when Frontier purchased the assemblies.[44] And the only website reference that Hercules provided states that the terms were "[e]ffective as of May 15, 2024," several years after Frontier's relevant purchases in 2020 and 2021.[45]

Hercules cites *Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.* in support of its position.[46] In *Chloe Z*, the defendant insurers moved to compel arbitration pursuant to the arbitration clauses in the plaintiffs' marine insurance policies issued by the defendants.[47] Each year, the plaintiffs' insurance brokers sent the defendants a document called a "slip" requesting insurance coverage and detailing

---

[42] 9 U.S.C. §§ 202, 205; *Balen*, 583 F.3d at 654-55; *Infuturia Glob. Ltd.*, 631 F.3d at 1138.

[43] Convention art. II.

[44] Docket 34 at 7.

[45] Docket 34 at 7.

[46] Docket 20 at 8-9 (citing 109 F. Supp. 2d 1236 (S.D. Cal. 2000)).

[47] 109 F. Supp. 2d at 1239-40.

the terms and policy type requested.[48] The slips expressly referenced the defendants' standard form policies containing arbitration clauses, clauses which were "ubiquitous" in the marine insurance market.[49] The defendants accepted the proposed coverage by stamping each slip, adding the date and policy number, and issuing certificates confirming the coverage and identifying any changes the parties had made to the standard policy terms.[50] The district court held that this exchange of written communications evidenced the insureds' assent to the insurance policies and the arbitration clauses contained in those policies.[51] Here, by contrast, none of the written documents exchanged between WRIA and Frontier references the catalog, the website, or an arbitration provision.[52] The sales documents therefore do not constitute an exchange of communications that demonstrates Frontier's assent to a contract containing Hercules's asserted arbitration provision.

Hercules also asserts that IES's quotation of promotional language from Hercules's 2014 catalog in IES's third party claim supports an inference that IES

---

[48] *Id.* at 1248.

[49] *Id.* at 1248-49.

[50] *Id.* at 1248.

[51] *Id.* at 1249-50.

[52] Docket 10 at 3-4; Docket 34 at 7-8.

and Frontier relied on the catalog.[53] IES cites those statements in its pleading in support of its allegation that Hercules misrepresented the quality of its products.[54] But IES does not allege that the catalog constituted a contractual agreement between Hercules and Frontier; nor does IES seek to enforce any contractual right arising from the catalog. Citing to an allegedly misleading representation in the catalog is not equivalent to asserting that the catalog created enforceable contract rights while simultaneously seeking to avoid the enforcement of its arbitration provision.[55]

Hercules also relies on *Oberstein v. Live Nation Entertainment, Inc.*[56] and *Patrick v. Running Warehouse, LLC*[57] to assert that website terms may become binding when a reasonable user would have seen those terms during a transaction and manifested assent through subsequent conduct.[58] But those cases involved users who conducted transactions entirely through the websites on which the

---

[53] Docket 20 at 9-10.

[54] Docket 1-2 at 22-23, ¶¶ 132-41.

[55] *Cf. Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1131-32 (9th Cir. 2013) (holding that false advertising claims based on marketing materials did not invoke purchase agreements containing arbitration provisions because the plaintiffs did not seek to enforce the agreements' "terms, duties, or obligations").

[56] 60 F.4th 505 (9th Cir. 2023).

[57] 93 F.4th 468 (9th Cir. 2024).

[58] Docket 20 at 9.

asserted terms appeared and where those terms were reasonably conspicuous.[59] Here, Hercules has not shown that Frontier purchased the assemblies through Hercules's website or took any action online that demonstrated its assent to the terms on the website. The Court therefore need not determine whether the website displayed any arbitration terms conspicuously because the record does not connect any Hercules website or its terms to Frontier's transactions with WRIA in the first instance.

The Court also denies Hercules's request for jurisdictional discovery. Hercules is the party that purportedly issued the applicable terms and sales documents, but it has not identified a transaction document incorporating an arbitration clause or Frontier's use of a contemporaneous Hercules website containing such a clause. Its request to investigate what Frontier may have known does not identify specific facts likely to establish that the asserted arbitration provision became part of the sales contracts between Frontier and WRIA.[60]

Based on the foregoing, the Court finds that any arbitration provisions in the Hercules catalog or website do not constitute an "agreement in writing" or an "exchange of letters" between Hercules and Frontier to arbitrate this dispute.

---

[59] *See Patrick*, 93 F.4th at 477; *Oberstein*, 60 F.4th at 515-17.

[60] *See Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (recognizing district courts' "broad discretion" over jurisdictional discovery); *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (affirming denial of jurisdictional discovery where the request rested on "little more than a hunch that it might yield jurisdictionally relevant facts").

## B. The Portland Testing Agreement

Hercules asserts that the Portland Testing Agreement supports removal because IES's allegations encompass "subsequent disputes involving how Hercules responded to the claims, including but not limited to, the testing."[61] In response, IES acknowledges that the Portland "testing results are relevant to the litigation as a factual matter, but this doesn't make the arbitration clause applicable to the pending suit."[62] The parties agree that the Portland agreement contains a written arbitration provision, but they dispute whether that provision could conceivably affect the resolution of the claims in this action.[63]

When, as is the case here, an arbitration clause is limited to disputes regarding the interpretation and legal effect of a contract, it ordinarily reaches disputes relating to the interpretation and performance of that contract itself.[64] By contrast, broader language extending arbitration to disputes "arising in connection with" an agreement may reach claims having a significant relationship to the contract.[65] The jurisdictional question is whether the Portland arbitration

[61] Docket 20 at 12.

[62] Docket 34 at 14.

[63] Docket 20 at 7, 11-12; Docket 34 at 14-15.

[64] *See Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 922-23 (9th Cir. 2011); *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983).

[65] *See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720-21 (9th Cir. 1999).

agreement "could conceivably affect the outcome" of this action.[66] Although that standard is broad, it "is not limitless."[67]

Hercules must show that arbitration under the Portland agreement could conceivably affect the resolution of an issue raised by the claims pending in this case at removal. Here, Hercules has not made that showing. The Portland agreement provides for arbitration of [a]ll disputes . . . regarding interpretation of the contract and the legal effect of contract."[68] But the claims pending in this case at removal did not dispute the Portland testing agreement's meaning or legal effect.[69] Hercules instead relies principally on the fact that the testing conducted pursuant to the agreement generated evidence relevant to the alleged defects.[70] That factual connection does not show that the terms of the Portland agreement could affect the resolution of any of the claims in this case that were pending at removal.[71]

IES's and Frontier's spoliation claims do not provide a closer connection. Those claims concern Hercules's alleged unilateral testing of the failed assemblies

---

[66] *Infuturia Global Ltd.*, 631 F.3d at 1138.

[67] *Cerner Middle E. Ltd*, 939 F.3d at 1016.

[68] Docket 1 at 3.

[69] *See* Docket 1-1 at 4-9; Docket 1-2 at 16-23.

[70] *See* Docket 20 at 11-12; Docket 1-2 at 16-17.

[71] *See Cerner Middle E. Ltd.*, 939 F.3d at 1015-16 (holding that an arbitration award did not support § 205 jurisdiction merely because its factual findings might be relevant to the pending claims).

in June 2023 without notice to IES or Frontier.[72] This alleged spoliation therefore preceded and is distinct from the Portland testing conducted with all parties' involvement in May 2024. Stated differently, the resolution of the spoliation claims does not require any interpretation of the Portland testing agreement.

Hercules also asserts that the parties disagreed during mediation about responsibility for the Portland testing expenses, but no claim concerning those expenses was pending when Hercules removed this action.[73] That disagreement therefore could not affect the resolution of the claims then pending.

Accordingly, the pleadings pending in this case at removal present no dispute concerning the interpretation or legal effect of the Portland agreement. Because the terms of that agreement could not conceivably affect the resolution of the claims in this action, the Portland agreement does not support removal under § 205.

**C. Plaintiffs' Settlement Agreement**

Hercules also references "a third agreement in writing signed by Plaintiffs to resolve disputes as to their dismissing all their claims against all parties."[74] Hercules asserts that "Plaintiffs . . . agreed to resolve any and all disputes by

---

[72] Docket 1-2 at 15-16, 22-23.

[73] Docket 20 at 12.

[74] Docket 20 at 7.

arbitration" in that settlement agreement.[75] But that settlement postdated Hercules's removal of this action and therefore could not supply a basis for removal jurisdiction.[76] In any event, Nuvista's and Umialik's claims have been dismissed with prejudice, and Hercules has not shown that IES or Frontier is bound by the settlement's arbitration provision or that arbitration under that provision could have an effect on any of their crossclaims against Hercules. The settlement agreement therefore does not support jurisdiction under § 205.

Because none of the asserted arbitration agreements supports jurisdiction under the Convention, and Hercules did not assert any other basis for federal jurisdiction in its Notice of Removal,[77] the action must be remanded under 28 U.S.C. § 1447(c).

## CONCLUSION

For the foregoing reasons, IT IS ORDERED:

1. IES's Motion to Remand at Docket 10 is **GRANTED**;

---

[75] Docket 20 at 3.

[76] *See Abada*, 300 F.3d at 1117.

[77] In its reply supporting dismissal, Hercules asserts in a footnote that the Court may exercise diversity jurisdiction "nunc pro tunc." Docket 36 at 6 n.1. However, Hercules did not invoke diversity jurisdiction in its Notice of Removal and a notice of removal "cannot be amended to add a separate basis for removal jurisdiction after the thirty day period." *ARCO Env't Remediation, LLC v. Dep't of Health & Env't Quality*, 213 F.3d 1108, 1117 (9th Cir. 2000) (citation omitted).

2. Hercules's Motion to Dismiss at Docket 19 is **DENIED without prejudice**;[78]

3. This action is **REMANDED** to the Superior Court for the State of Alaska, Fourth Judicial District at Bethel;

4. The Clerk of Court shall enter a final judgment accordingly.

DATED this 30th day of September, 2026, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

[78] Because the Court concludes that it lacks subject matter jurisdiction, it does not reach Hercules's motion to dismiss. Upon remand, Hercules may renew the issues raised in that motion to the state court, including personal jurisdiction, venue, and sufficiency of service. *See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 89 (1991) (holding that § 1447(c) affords a federal court without subject matter jurisdiction "no discretion to dismiss rather than remand").